AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

5/13/21

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Guardian Self Storage, Unit A 716, located at 2080 Lyons Road, Miamisburg, Ohio | ) ) ) ) ) ) | Case No. 3:21MJ186 |
|---|---|---|

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ____Southern____ District of ____Ohio____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841 | Possession with Intent to Distribute Controlled Substances. |
| 21 USC § 846 | Conspiracy to Possess with Intent to Distribute Controlled Substances. |

The application is based on these facts:
See attached affidavit.

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Robert M. Buzzard*
Applicant's signature

SA Robert Buzzard, FBI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__Telephone__ (specify reliable electronic means).

Date: 5/13/21

City and state: _____

Hon. Sharon L. Ovington, U.S. Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Robert Buzzard, hereby duly sworn, declare and state:

### INTRODUCTION

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency. I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2. I have served as an FBI SA since January 2002. I am currently assigned to the Cincinnati Division, Dayton Resident Agency and serve on the FBI's Southern Ohio Safe Streets Task Force (SOSSTF). Since 2002, I have participated in investigations involving narcotics trafficking and have received specialized training on the subject of narcotics trafficking and money laundering from the FBI. I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Based on my training and experience – including my participation in the investigations referenced above – as well as discussions and interactions with other experienced FBI SA's, Task Force Officers ("TFO"), and narcotics investigators, I am familiar with the manner in which drug traffickers and their organizations operate within the United States. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

    a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

b.     It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c.     That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d.     It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e.     It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f.     It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g.     It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h.     That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i.     When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j.     Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k.     It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their

associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m. Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n. Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o. The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p. Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q. Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of applications for search warrant for the following storage unit – namely:

    a. Guardian Self Storage, Unit A 716, located at 2080 Lyons Road, Miamisburg, Ohio, (hereinafter "**Storage Unit**")

4. Reference is made throughout this affidavit to the following premises:

    a. 8070 Timberlodge Trail, Centerville, Ohio 45458, (hereinafter "**Location 1**"); and

    b. 2018 Kia Stinger, white in color sedan, Ohio license plate number JES5999, Vehicle Identification Number (VIN) KNAE35LC3J6040164 (hereinafter "**Vehicle 1**").

5. As detailed more fully below, I submit that there is probable cause to believe that evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in relation to the following offenses exist and can be found inside **Storage Unit**– namely:

    a. Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, and

    b. Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 846.

6.     A list of specific items to be seized from the premises described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference.  Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found at/in the premises described above.  I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with above-described drug trafficking offenses is located at **Storage Unit**.

## PROBABLE CAUSE

7.     In 2018, myself, members of the FBI's Southern Ohio Safe Streets Task Force, and members of the Montgomery County Sheriff's Office RANGE Task Force began investigating Jermain TREADWELL for drug trafficking offenses.  Intelligence received from RANGE Task Force members indicated TREADWELL was conducting car-to-car fentanyl sales around the Dayton Mall area in Miami Township, Ohio and Miamisburg, Ohio.  More specifically, RANGE Task Force members interviewed more than one Confidential Informant (CI) who were actively purchasing fentanyl from TREADWELL in 2018 and 2019.  The Confidential Informant(s) explained to law enforcement officials that TREADWELL operated a cellular telephone number (known to law enforcement officials as a "money phone") to advertise, communicate, and coordinate car-to-car narcotics sales.  I know through my training and experience that a car-to-car narcotics transaction is a method used by street level drug traffickers wherein they direct a drug customer to a certain area and pull up directly next to the customer in a vehicle to conduct a quick exchange of narcotics for U.S. currency.  The car-to-car narcotics transactions are preceded by cellular telephone communications between the seller and the buyer wherein the seller directs the buyer to a specific location for the drug deal.  The

cellular telephone communications between the seller and buyer also include discussions pertaining to the amounts of narcotics being sold and the price.

8. I am also familiar with TREADWELL from a previous FBI investigation wherein he pled guilty on April 7, 2011 in the Southern District of Ohio (case number 3:10-CR-158) to Conspiracy to Distribute and Possess with Intent to Distribute 100 grams of heroin. TREADWELL was subsequently sentenced in that case to five years and three months incarceration. TREADWELL was released from federal prison in the later part of 2015. In the previous investigation of TREADWELL, he utilized cellular telephones (money phones) to coordinate the street-level sale of illegal narcotics. I also learned through the previous investigation TREADWELL used the street name/nickname "Bubba".

9. On April 8, 2019, RANGE Task Force Detective J. Samples interviewed an individual, hereinafter referred to as Confidential Informant One (CI1). CI1 was a user of street level amounts of heroin and fentanyl and indicated he/she had been purchasing those narcotics from TREADWELL for approximately one year. CI1 explained he/she would contact TREADWELL on his cellular telephone (money phone) and place an order for narcotics. TREADWELL would direct CI1 to a general area in and around Miami Township/Miamisburg, Ohio and direct CI1 to call back when he arrived in that area. CI1 would place a second call to TREADWELL when he arrived in the area and TREADWELL would then direct him/her to a specific location to complete the transaction. Once CI1 arrived at the final destination, TREADWELL would arrive in a vehicle and conduct a car-to-car narcotics transaction with CI1. CI1 advised TREADWELL actively sells narcotics from approximately 9/9:30AM to 2:30PM or 3:00 PM and then from 4:00PM until whenever. CI1 knew TREADWELL paused his narcotics sales around 2:30PM/3:00PM because he had to pick his kid up from school.

10. On April 9, 2019, Detective J. Samples utilized CI1 to conduct a controlled purchase of fentanyl from TREADWELL. Prior to the purchase, Detective Samples met with CI1 in a pre-determined location and conducted a search of CI1's person and vehicle for contraband (none were found). CI1 was provided $50 in RANGE buy funds to purchase a street-level amount of fentanyl. CI1 was also equipped with a wireless monitoring device for RANGE members to listen to the narcotics transaction real time between CI1 and TREADWELL. CI1 contacted TREADWELL on his money phone and placed an order for fentanyl. TREADWELL directed CI1 to "get off at the mall." Once CI1 arrived in the area, he re-contacted TREADWELL on the money phone and was directed to an apartment complex in Miami Township, Ohio. TREADWELL arrived in the area of the apartment complex driving a maroon Chevrolet Impala registered to a female named Shacara D. Elijah. TREADWELL pulled his vehicle alongside CI1's vehicle (car-to-car) to conduct the transaction. CI1 provided TREADWELL $50 in RANGE buy funds and TREADWELL handed CI1 15 gel caps containing suspected fentanyl. Following the transaction, TREADWELL drove around the area and conducted two illegal U-turns, which is a common counter surveillance measure utilized by drug traffickers to identify law enforcement surveillance units. CI1 met with Detective Samples at a pre-determined location and surrendered the suspected narcotics as evidence. CI1 and CI1's vehicle were searched again for additional contraband and none was found. The 15 gel caps were submitted to the Miami Valley Regional Crime Lab for analysis and were found to contain fentanyl, a Schedule II controlled substance.

11. In the Fall of 2019, myself and task force members executed a federal search warrant at a residence in Dayton, Ohio. During that search warrant, kilogram amounts of fentanyl and crystal methamphetamine were seized along with approximately 15 cellular

telephones. In November of 2019, a search warrant was obtained to search the contents of the cellular telephones seized. Stored on one of the seized cell phones were multiple text messages, photos, videos, and call logs associated with the distribution of illegal narcotics. One of the contact phone numbers stored in the cell phone belonged to TREADWELL, aka "Bubba." I reviewed stored text messages in the seized cell phone and noted multiple text message communications with TREADWELL's number, wherein drug trafficking activities were discussed.

12. On January 15, 2020, I interviewed an individual, hereinafter referred to as Confidential Source One (CS1). CS1 has provided me truthful and reliable information in the past that resulted in the seizure of large quantities of illegal narcotics. CS1 was not providing information for consideration in a pending prosecution. CS1 advised she/he personally knew TREADWELL, aka Bubba to be selling multiple ounces of fentanyl/heroin per day to customers who reside in the Franklin, Ohio area. CS1 knew this information from direct conversations with TREADWELL. CS1 advised TREADWELL is residing in Centerville, Ohio.

13. In January of 2020, I issued an administrative subpoena to Dayton Power and Light (DP&L) for active utility accounts associated with TREADWELL's girlfriend Shacara D. Elijah. DP&L reported Elijah had an active utility account at **Location 1.** As previously stated in paragraph 9, TREADWELL utilized a vehicle registered to Elijah to conduct the controlled purchase of fentanyl on April 9, 2019.

14. On March 29, 2021 and continuing thereafter, I interviewed an individual, hereinafter referred to as Confidential Source Two (CS2). CS2 has provided me information, which has been verified through independent investigation and proven truthful. CS2 is providing information in exchange for consideration in a pending narcotics

investigation/prosecution. CS2 advised she/he personally knows TREADWELL to be a narcotics trafficker operating in the Dayton, Ohio area. In the Summer and Fall of 2019, CS2 personally witnessed TREADWELL purchase multiple ounces of fentanyl, which TREADWELL intended to re-sale to individuals in the Dayton, Ohio area.

15. On May 6, 2021, I conducted surveillance at **Location 1**. During the surveillance, I observed TREADWELL enter a white Kia Stinger, bearing Ohio license plate number JES5999 (**Vehicle 1**) that was parked in the attached garage at **Location 1.** TREADWELL was the sole occupant and driver of **Vehicle 1**. TREADWELL exited the garage and drove directly to a parking lot located at 1051 Miamisburg Centerville Rd., Washington Township, Ohio. Upon arrival, TREADWELL parked next to a white Ford sedan registered to a white female from Franklin, Ohio. I watched TREADWELL conduct a car-to-car narcotics transaction (based on my training and experience) with occupants of the white Ford sedan. Following the transaction, TREADWELL drove around the same parking lot slowly and appeared to be conducting counter surveillance measures to ensure he was not being followed by law enforcement. I conducted a background check on the white female owner of the Ford sedan and noted she had multiple prior arrests for drug possession charges.

16. Approximately forty minutes after the first car-to-car transaction, TREADWELL arrived back at the same parking lot (1051 Miamisburg Centerville Rd.) in **Vehicle 1** and pulled next to a turquoise Chrysler sedan. TREADWELL conducted what appeared to be a car-to-car narcotics transaction with a white male occupant. Following the transaction, TREADWELL pulled away and again drove around the parking lot appearing to conduct counter surveillance measures. The registered owner of the Chrysler sedan was a white male with an address in Middletown, Ohio. I conducted a background check on the white male owner and noted several

prior arrests for drug possession and tampering with evidence.

17. A registration check on **Vehicle 1** listed the owner as TREADWELL.

18. On May 7, 2021, I conducted surveillance at **Location 1** and observed **Vehicle 1** exit the garage and travel to the Centerville Middle School located at 7056 McEwen Rd. I noted the time was approximately 3:30PM and consistent with TREADWELL picking his kid up from school, consistent with CI1's reporting in paragraph 8. **Vehicle 1** traveled from the school back to **Location 1**. A short time later, **Vehicle 1** left **Location 1** and traveled to the parking lot of 1051 Miamisburg Centerville Rd. **Vehicle 1** backed into a parking spot and remained there for several minutes. The driver of **Vehicle 1** did not exit and did not appear to meet with any other vehicles before leaving. **Vehicle 1** eventually traveled back to **Location 1** and was observed parked in the garage. I noticed an electronic surveillance camera affixed to the exterior of **Location 1** above the garage. Based on my training and experience, I know drug traffickers install surveillance cameras on their residences and stash houses to alert them of law enforcement presence or the presence of their adversaries.

19. On May 8, 2021, I interviewed another individual, hereinafter referred to Confidential Source Three (CS3). CS3 has provided me information in the past, which has been verified through independent investigation and proven truthful. CS3 is not providing information for consideration in a pending prosecution. CS3 reported he/she knows TREADWELL personally and knows him to sell illegal narcotics. CS3 advised TREADWELL utilizes "money phones" to sell narcotics and a lot of his customers are white males and white females who reside in Franklin and Middletown, Ohio. CS3 advised TREADWELL lives in the Centerville, Ohio area and his girlfriend/significant other is Shacara Elijah.

20. On May 10, 2021, I conducted a spot check at **Location 1** and observed **Vehicle 1**

parked in the garage. Later that same day, I observed a white Jeep Cherokee, bearing Ohio license plate number JIJ5037 arrive at **Location 1** and park in the driveway. A registration check on the Jeep Cherokee listed TREADWELL as the registered owner and Shacara Elijah as an additional owner.

21. On May 11, 2021, I spoke with a representative of Dayton Power and Light (DP&L) and verified Shacara Elijah still has an active utility account at **Location 1**.

22. On May 12, 2021 I obtained federal search warrants, authorized by federal Magistrate Judge Sharon L. Ovington, for **Location 1** and **Vehicle 1**.

23. On May 13, 2021 myself and members of the FBI executed the search warrants. At the time of the search warrants, TREADWELL and Shacara Elijah were located inside **Location 1**. During a subsequent search of **Location 1**, myself and members of the FBI located and seized baggies containing suspected cocaine, fentanyl residue, a digital scale, empty gel caps (consistent with the packaging and distribution of suspected narcotics), a large sum of United States currency, three firearms, and ammunition.

24. During the search of **Vehicle 1**, FBI members located a small Guard Security key consistent with padlocks commonly placed on storage units. Based on prior investigations involving TREADWELL, I knew he once had a storage unit at Guardian Self Storage located at 2080 Lyons Road, Miamisburg, Ohio.

25. FBI members contacted a representative at Guardian Self Storage and learned Shacara Elijah has Unit A 716 ("**Storage Unit**") rented at the facility. Storage records indicate Shacara Elijah has had the storage unit since April 2018.

26. I requested the assistance of Dayton Police Department Canine Officer Jeremy Stewart and his canine partner, Weston. Canine Weston is a State of Ohio certified narcotics

canine. Officer Stewart and Weston conducted free air sniffs around several storage unit doors with no positive alerts. Officer Stewart and Weston then conducted a free air sniff around the exterior of the target **Storage Unit**. Canine Weston alerted to the odor of narcotics at the exterior storage unit door of Unit A 716.

27. I compared the key found on the keyring of **Vehicle 1 (Guard Security key)** to the lock on the **Storage Unit** and the key fit the lock.

## CONCLUSION

28. Based on the facts set forth in the Affidavit, I believe there is probable cause that evidence associated with the above listed drug trafficking offenses are located within the target **Storage Unit**.

_Robert M. Buzzard_
Robert Buzzard
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me on this
13th day of May, 2021.

_Sharon L. Ovington_
Sharon L. Ovington
United States Magistrate Judge

## ATTACHMENT A

**Storage Unit:** The place to be searched is storage unit A 716, located at Guardian Self Storage, 2080 Lyons Rd., Miamisburg, Ohio 45342. Storage unit A 716 is further depicted in the following photograph.



## ATTACHMENT B

### PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to methamphetamine, and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.